**MINNESOTA MINING AND MANU-
FACTURING COMPANY, Plaintiff,**

**v.**

**PROJECTION OPTICS COMPANY, Inc.,
Dunbar & de Zeng, Inc., and James
E. Duncan, Inc., Defendants.**

**Civ. No. 10887.**

United States District Court
W. D. New York.

June 15, 1966.

Charles Shepard, Rochester, N. Y., Edward A. Haight, Britton A. Davis, Chicago, Ill., Harold J. Kinney, Robert E. Granrud, St. Paul, Minn., for plaintiff.

Bayer & Vogt, Rochester, N. Y., for defendants; Darby & Darby, Morris Relson, William F. Dudine, Jr., New York City, of counsel.

BURKE, Chief Judge.

Trial before the undersigned at Rochester, N. Y., November 29 to December 3, 1965.

### FINDINGS OF FACT

1. This is a patent infringement suit based upon Appeldorn Patent No. 3,126,-786. The patent was issued March 31, 1964, on an application filed July 20, 1962. It is exclusively owned by the plaintiff by assignment from Appeldorn, the applicant. The patent is for an Overhead Projection System. An overhead projector is a visual demonstration device commonly used as an aid in teaching. Its purpose is to project a horizontal image onto a vertical screen.

2. Defendant, Projection Optics Company, Inc., is a New York corporation. It has a factory at Rochester, N. Y., employing about thirty people in the manufacture of lenses. It is charged with infringement by sale of its Travel-Graph (Model 21000) overhead projectors, made by Charles Beseler Company of East Orange, New Jersey. Projection Optics is a distributor. Defendant, Dunbar and de Zeng, Inc., is a New York corporation and a Rochester dealer. It is accused of infringement by sale of Porta-Scribe overhead projectors made by Beseler (Models 15700 and 15710). James E. Duncan, Inc., is a New York corporation and a Rochester dealer. It is accused of infringement by sale of Projection Optics' Travel-Graph projectors. Beseler is a partnership comprised of two partners —Martin F. Myers and Philip Berman. Each owns fifty per cent of the shares of Projection Optics. It employs about three hundred people. All of the accused projectors are made by Beseler in New Jersey. The Travel-Graph projector and the Porta-Scribe projector are essentially the same. Claims 1, 2, 3, 4, 5, 7 and 9 are at issue in this suit.

3. Beseler has been producing overhead projectors since about 1947. Prior to 1958 the plaintiff, 3M, was producing its Thermofax Copier Machine. By 1960 it was selling materials for use on that machine which would produce transparencies, useful for overhead projectors. 3M entered the overhead projector business in 1960. It first had its projectors made for it by another company (Model 42 by Buhl Optical Company). It sold its Model 42 projectors for a brief period in 1960. It then produced a revised Model 42 of its own manufacture during 1960–1961, and a portable projector (Model 43) in 1960–1962. In 1961 3M undertook a redesign of its projectors to cut their cost and, as a consequence, their size and weight, by eliminating certain features in their then current models, and, by resorting to less expensive construction. It produced the commercial form of the Appeldorn projector and placed it on the market in August, 1962. There were two models, portable Model 60, priced at about $230, and standard Model 66 priced at about $170. To meet this competition, Beseler brought out its own low-cost projectors. It is these projectors which are accused here of infringing the patent in suit.

4. One of the Beseler partners, Martin F. Myers, saw the new 3M projector in September, 1962. By about December, 1962 he decided that Beseler should compete with the new 3M projectors. A prototype was completed in January, 1963. Limited production started in March, 1963. Beseler was stimulated into development and production of its Porta-Scribe projector by the 3M Model 66 projector, and by its favorable accept-

ance in the market. In November a Beseler dealer in Connecticut was asked by a customer to repair one of the new 3M projectors. The dealer, being impressed with the unit, discussed it with Myers and recommended that Beseler make one like it. Myers borrowed the 3M projector from the dealer, examined it, and directed his chief engineer to make careful measurements of it. By December of 1962 Projection Optics and Beseler had reached a decision to bring out a projector to compete with the new 3M models. Two 3M projectors, a Model 66 and a portable Model 60, were then purchased by Beseler. Near the end of January, 1963 both Beseler and Projection Optics introduced the accused Porta Scribe and Travel-Graph projectors to their dealers. The first model was sold in March, 1963. Similar to the favorable market acceptance of the 3M Appeldorn projectors, the accused projectors have enjoyed consumer acceptance and substantial commercial success. 3M learned of Beseler's new projector as soon as it came on the market.

5. The Appeldorn Patent was issued on March 31, 1964. Two weeks later this suit was started. No previous notice was given to Beseler or any of its customers. This was just one week before the Department of Audio-Visual Instruction of the National Education Association trade convention held in Rochester, N. Y., on April 20, 1964. This was the most significant marketing convention of the year. The start of the suit was accompanied by a public news release and instructions to 3M sales personnel for use in sales promotion. 3M aggressively engaged in a greatly enlarged sales effort for its new projectors by plentiful distribution of literature and by sales task forces and telephone campaigns. It conducted dealer seminars and contests. It published magazines and actively advertised. It gave away 7500 projectors in Assistance Grants to Education. It promoted sales at trade and professional conventions. Its projector sales were also aided by its sales of transparency making copy machines.

6. There is no convincing evidence that the commercial success of 3M's Model 66 and 60 projectors was due to those factors by which the patent claims differed from the prior art.

7. In the introductory paragraph, the patent states that it relates to "a projection system including a novel lens assembly." The patent then contrasts the Appeldorn projector with prior art projectors, which it claims were deficient in having large projection heads that hinder free access to the transparency stage and interfere with visibility by the audience. The size of the projection head has little effect on the utility of the projector because the teacher or speaker affords a much more important obstruction. The only structure whose size or economy is referred to in the patent is the head. Neither the patent nor its claims refer to or concerns the size or weight or cost of the entire projector. The patent covers projectors without regard to their size, weight or cost.

8. The Appeldorn projector has the conventional general arrangement of a body and a head. The body has an in-line type of light-cone-producing means, with a "suitable" light source, exemplified as an iodine-vapor incandescent lamp. This lamp was in the prior art. Its qualities making it suitable and obvious for use in the in-line type of overhead projectors were known. The body is described in the patent as "a light source and the usual means for directing light from the source through a horizontally held transparency and upwardly in a cone of light." No patentable novelty resides in the body portion of the projector. The projection head is the only possible novelty in the patent. The patent states: "This invention relates to a projection system including a novel lens assembly and more particularly to a projection system and lens assembly for use in overhead projectors or the like wherein it is desirous to bend the path of the projected light." The bending of the light path is accomplished solely in the head. The supposed disadvantage of large size of projector head is said to be

overcome by providing a small head. The supposed disadvantage of necessity of tilt of the entire projector was said to be overcome by provisions for tilting the head alone. The problems to which the patent was directed were supposedly solved by the particular projection head. This is what 3M has publicly asserted for the scope of its patent. On April 17, 1964, 3M sent out to all of its overhead projector sales representatives a notice concerning the commencement of the present suit, and accompanying instructions on what these representatives should say to customers. The following answer was suggested by 3M's legal department to a possible question: "Q. What does the 3M patent cover? A. The Appeldorn patent covers 3M's Model 60 and 66 overhead projectors and any other overhead projector which has a compact projection head consisting of a pair of converging meniscus lenses, and an intermediate mirror in a triangular arrangement." A meniscus lens is crescent shaped, or concavo-convex.

9. An important aspect of the patent device is that the head pivots or tilts as a unit, so that the fixed relationship between the mirror and the two lenses (which together form the lens system) is not changed. Whenever pivoting or tilting occurs, it is the entire head assembly which moves, moving both lenses and the mirror together.

10. The unitary character of the projection head and of its pivoting arrangement is emphasized throughout the patent by numerous statements making clear that it is the entire head, the complete lens assembly, which is pivoted for elevating the screen image. The patent specification discloses only a unitary head and lens-mirror assembly, consisting solely of two lenses and a mirror, pivoting as a whole. No other form of head is suggested by the disclosure. In particular there is no suggestion that the two lens elements may be movable relative to one another. The invention described in the patent concerned a unitary projection head with both lenses pivoted together and remaining in fixed relation to each other as the head is pivoted.

11. The application for the patent was filed July 20, 1962. It contained twelve claims. All the claims were limited to the unitary head, where the mirror and both lenses were rigidly connected together and pivoted together. The lenses were specified as of the meniscus type. 3M learned of the competing Beseler projector in February, 1963 and saw a sample of it on March 30, 1963. By April 9, 1963 a Visual Products Patent Status meeting was held to review the "legal aspects" of the situation. At that meeting a new claim wording was discussed and new claims were proposed. On April 11, 1963 3M informally proposed three new claims (and an alternate to one of them) to the Patent Office, as a prelude to a requested interview with the Examiner, which was refused. On May 2, 1963 a sample Beseler projector was procured by 3M. On May 16, 1963 a formal amendment was filed in the Patent Office cancelling all original claims and substituting an entire new set of eleven claims. These new claims attempted to change materially the nature of the invention previously claimed by Appeldorn. In an obvious effort to cover the Beseler projector, the unitary character of the head and the pivoting of it as a unit (described in the application as essential) were repudiated as even a part of the invention. Instead, a new feature was added, a pivotal mirror where previously the head as an entity was required to be pivotal. This was the first indication of a projector having a projection head which had other than a "unitary" head or which included "a means for pivoting the mirror" for maintaining the prescribed ray relationship. Nowhere in the patent was there any disclosure of such a separately pivoted mirror nor where to place its pivot point. This change was made notwithstanding that pivoting the mirror alone in the Appeldorn device would not maintain the required ray relationship. The reflected ray could not then stay even near the center of the second lens, which the pat-

ent says is essential. The apparent reason for the change was Beseler's competing projector. The invention which Appeldorn had applied for was limited to a unitary head. It was only after Beseler had come up with this different arrangement, where the mirror pivoted separately from the head, that 3M attempted to cover it in the Appeldorn application. By its new claims, 3M attempted to repudiate the previously claimed limitation that the lenses were meniscus lenses, by reciting them merely as converging lenses, broad enough to include plano-convex and bi-convex lenses. On August 8, 1963, the Patent Office rejected all these new claims, relying principally on prior art Bancroft Patent 2,310,270. The Examiner described it as having a projection head which "contains a pair of converging lenses and reflecting or mirror means," and said that the entire head may be pivotally mounted. The Examiner further held that "whether the lenses employed are meniscus or not is not considered to be patentably material." In response to this rejection, on October 18, 1963, and after an interview, 3M cancelled all of the pending claims and substituted nine new claims, which became the claims of the patent in suit. By this amendment 3M again changed its claims. After having initially limited the invention to meniscus lenses, and then attempting to repudiate meniscus lenses as not critical, it again urged patentability because the lenses were of meniscus shape. The Appeldorn patent was repeatedly rejected by the Patent Office until Appeldorn limited it to the use of meniscus shaped lenses with a mirror between them. This feature was the essence of the patent. Other features such as the in-line light source, the iodine-vapor lamp, the focusing by raising the head, the position of the real image of the light source, the pivoting of the head (or mirror), and placing the mirror between the lenses, were all recited in claims which were cancelled or restricted in response to rejections on prior art. Such features were thereby disclaimed and abandoned as possible patentable features.

12. The accused Porta-Scribe projector has the usual body and head. The body has an in-line light source, using an iodine-vapor and a Fresnel lens condensing system. The body is essentially the same as that of the prior art Bancroft and Projecto-Lite projectors. The projection head is a "segmented" head in contrast with the unitary head. The Porta-Scribe head is made up of four principal components: 1—a first fixed meniscus lens and its fixed lens housing, 2—a second pivotal meniscus lens and its pivotal housing, 3—a mirror and its pivotal mounting, 4—an angle-halving linkage between the second movable meniscus lens housing and the mirror pivotal mounting, to cause the mirror always to move through half the angle through which the second lens is moved. The light cone enters the first lens, passes to the mirror by which it is reflected to pass through the second lens and then to the screen. The first lens is fixed by its housing to remain always coaxially aligned with the incident axial ray. That housing is secured to a projection head bracket, which is slidably carried by a post to permit up and down adjustment of the entire head by use of a focusing knob. In this way focusing is accomplished in the conventional manner by moving the entire head. The second meniscus lens and its lens housing are pivotable on the fixed lens housing, and hence are pivotable relative to a bracket about a pivot point. The mirror is separately pivoted on the head bracket about the same pivot point, and the mirror is linked by the angle-halving linkage to the second lens housing. When the second lens housing is tilted either up or down, the linkage causes the mirror to tilt in the same direction but at half the amount. Thus, when the second lens is tilted up 20 degrees, the mirror is tilted up 10 degrees by the linkage. This elevates the reflected ray by 20 degrees and elevates the screen image by the same angle. The linkage assures that the axial ray, after reflection by the mirror, enters the sec-

ond lens coincident with that lens' axis, and remains coincident no matter what image elevation angle is used. In all positions of adjustment of the head, the first lens remains coaxially aligned with the incident axial ray. It does not pivot at all but remains parallel to the projection stage and square with the axial ray, even when the head is raised to maximum position or when the second lens and mirror are pivoted to maximum tilt. The second lens, mirror, and linkage, are aligned and connected, so that as they pivot, the axial ray always passes coaxially through and square with the second lens also. The axial ray thus has a fixed relation to the two lenses for all elevations of the screen image. In the accused devices, the two separate concentric pivot points (for the mirror and for the second lens) are both located near the midpoint of the mirror, in the plane of its reflecting surface, and hence are only one-half as far above the first lens as in Appeldorn's patent.

13. In 1952 Beseler began the manufacture and sale of the Junior Vu-Graph projector. From then up to now this Junior Vu-Graph projector has been sold with three successively different "Bestar" projection lens arrangements, referred to as the first, second, and third versions. Only the first and second need be considered here. The first version was made and sold in 1952 and 1953. The second version was made and sold from 1953 to 1956. Both versions preceded the patent filing date by more than one year. The Patent Office did not have these projectors before it as prior art.

14. The Junior Vu-Graph has a body with "the usual means" for producing the cone of light passing upwardly through the projection stage, with a "bent" light source. It is a wide-angle projector. In the head, the cone of light enters a fixed first 4½″ meniscus lens, which is coaxial with the central (axial) ray of the light cone. Above the first fixed lens is a pivoted mirror which reflects the light horizontally so that the axial ray passes coaxially to a pivoted second 3″ meniscus lens and then to a screen. An angle-halving linkage connects the pivoted sec-

ond lens with the pivoted mirror, so as to cause the mirror always to move through half the angle through which the second lens tilts. To elevate the screen image, the second lens and its housing are pivoted upward by the angle it is desired to elevate the image on the screen. The linkage then automatically raises the mirror by half that angle. Focusing is accomplished by varying the distance of the second lens to the stage, by moving the second lens in or out of its housing barrel. The real image of the filament is inside the head, between the two lenses. The second version had exactly the same body as the first. The head of the second version was slightly modified. The vertical light cone first impinged on the mirror and was reflected onto a lens assembly consisting of a pair of spaced equal meniscus lens elements, through which light passed to the screen. The lens elements had Y values of 3.4 and 2.5. (Y value is a term specifically defined in the patent as the ratio of focal length divided by radius of curvature. These Y values of version #2 are within the ranges of 3.3–3.7 and 2.3–2.7, claimed by Appeldorn in claim 6). The same angle-halving linkage coupled the mirror to the lens assembly to move the mirror by one-half the angle through which the lens was moved. This second version was adopted in 1953 because it was cheaper and to make the two-meniscus lens system more simply replaceable by a higher-quality and higher-cost three lens "Actar" system, merely by replacing a single removable lens barrel. Focusing is accomplished by varying the distance from the two-element lens assembly to the stage, by sliding the lens assembly horizontally in its mounting. The real image of the lamp filament is between the two lenses.

15. In 1912 Spencer Lens Company of Buffalo, N. Y., offered for sale overhead projectors under the trade name Delineascope. In that year it published a catalog which illustrated and described a Model 6 Delineascope, useful as a lantern slide, and microscope projector, and a vertical attachment which, when added, makes the Delineascope an overhead projector.

This catalog was published more than a year before Appeldorn filed. It was part of the prior art. This publication was not cited or considered by the Patent Office. The Delineascope has a "bent" light source, with the "usual means for directing light from the source through a horizontally held transparency and upwardly in a cone of light." It has a wide projection angle. Above the stage is a projection head. The incident axial ray of the cone of light passes through a first meniscus lens to a light-reflecting mirror in the form of a prism, which reflects the light rays directly through the center of a second meniscus lens from which it proceeds to the screen. The two lenses and mirror are in a fixed triangular arrangement. The meniscus lenses are 2½" in diameter and are small compared to the 6" condenser lenses. The meniscus lenses are of the corrected or compound type, each lens being formed of two pieces of glass. Such compound lenses serve the same purpose as simple lenses in a better way, yielding improved performance. The Delineascope publication suggests the use of simple meniscus lenses. The simple lenses would obviously be used if cost were the criterion. The axial ray remains coincident with the axes of both the first and second lens at all times. The real image of the light source is focused at the reflecting means, between the two meniscus lenses. For focusing the image on the screen, the projection head is adjustable as to height above the transparency stage. The Delineascope publication does not show any provision for moving the head to elevate the screen image. However, this is shown by the Bancroft patent referred to below.

16. The Ozalid Projecto-Lite projector was on the market in 1960, more than a year before the Appeldorn application date. It was not considered by the Patent Office. This projector had an incandescent lamp light source directly beneath the condenser lens which produced a converging cone of light through the projection stage. It therefore has an in-line light source. The head was supported above the transparency stage on the vertical pivot. It consisted of a three-element Cooke triplet projection lens and a pivoted mirror above it. The vertical cone of light entered the lens and passed onto the mirror. The mirror was pivotable to elevate the screen image in the conventional way. The real image of the filament was between the elements of the lens. Focusing was accomplished by raising the entire head on its post by a focusing knob.

17. Bancroft Patent 2,310,273 (1943) was cited by the Patent Office against Appeldorn. Appeldorn limited his claims to distinguish over Bancroft. Bancroft discloses an overhead projector for projecting bowling scores. Its principal difference from the patented projector is that Bancroft projects his images onto an overhead screen in front of the operator whereas Appeldorn's projector projects its image onto a screen in back of the operator. Bancroft discloses an in-line light source, essentially the same as that of Appeldorn. Bancroft has a lamp directly underneath and in line with a condenser lens and transparency projection stage, and without a pre-condenser. Above this Bancroft has a projection head which is vertically adjustable for focusing. The head contains the first lens element, a flat mirror, a roof mirror, and a second lens element. Bancroft shows how to raise or lower the screen image. He states that the entire head may be pivotally mounted for this purpose. This amounts to a general teaching that the screen image of an overhead projector may be elevated by pivoting the projection head. Bancroft shows every essential feature of the Appeldorn patent except the use of a single mirror and use of meniscus-shape of lens. The roof mirror was required because Bancroft projected his images forwardly. He recognized that the usual overhead projector would produce a reversed image if projected forwardly. To re-reverse it back to normal, Bancroft used the roof mirror which was unnecessary for rear-projecting overhead projectors. Any ordinarily skilled person desiring to use the Bancroft device for rearward projection

would have known that the roof mirror should be removed as unnecessary and the flat mirror repositioned to accommodate this change. It would have been obvious to eliminate the roof mirror. The Bancroft lenses are bi-convex in shape. The patent points out that the bi-convex lens system is "for the sake of simplicity as a single lens" and that it is one of the characteristic advantages of his system that "relatively simple and inexpensive lenses may be used." Meniscus lenses are among the simplest lens forms. This is a sufficiently clear teaching to suggest the use of meniscus lenses in place of the bi-convex lenses shown in Bancroft's drawing. The properties and advantages of meniscus lenses were well known. Only prior art procedures are needed to compute the lens curvatures.

18. Heimstadt-German Patent 275,-988 (1912) shows a pair of corrected or compound meniscus lenses with a pivoted mirror in between, serving as a projection head for a motion picture projector. This is a "bent lens assembly", with a pivotable mirror. Heimstadt was not considered by the Patent Office.

19. Hahn-German Patent 382,193 (1922) shows a pair of compound meniscus lenses separated by a reflecting mirror. The patent states "one can enclose in a known manner between the two halves of the objective a prism which bends the beam of light by 90 degrees so that the plane of the film scrip makes a right angle with the plane of the projection screen." It has a wide projection angle. Hahn teaches Appeldorn's "bent" lens assembly.

20. Muller-German Patent 404,438 (1924) was not considered by the Patent Office. Muller shows the use of a pair of symmetrical (identical) meniscus lenses in a lantern slide projector and an overhead opaque projector.

21. In designing and developing the accused Porta-Scribe projector Beseler intended to and did draw on its own earlier Junior Vu-Graph and other prior art projectors, and based its new projector on the prior art. The Junior Vu-Graph first version had essentially the same structure as the accused Porta-Scribe projector. The Junior Vu-Graph has a "bent" light source while the accused Porta-Scribe has an "in-line" light source with an iodine-vapor lamp. This is an immaterial difference, since the "in-line" light source was known in the art (Bancroft and Ozalid). The Junior Vu-Graph light source is directly beneath the stage and condenser. The "in-line" and "bent" light systems are equivalent and interchangeable. It would have been obvious to an ordinarily skilled person in 1960 to use an "in-line" light source, since the non-darkening iodine-vapor lamp was then commercially available, which removed a major deterrent to the use of the in-line arrangement, and since the omission of a pre-condenser and mirror merely reduced cost at the expense of uniformity of illumination. The accused projectors have equal meniscus lenses, while the Junior Vu-Graph first version lenses were somewhat unequal. This is immaterial, since equal lenses had been used in prior art projectors and it would have been obvious to an ordinarily skilled person to use equal lens size. The use of symmetrical lens systems was common and their advantages were well known.

22. The Junior Vu-Graph focused its image by moving only one lens element to change its distance from the stage, while the accused Porta-Scribe focuses by raising the entire head. This is immaterial, since focusing by head movement has long been conventional and interchangeable with other focusing methods. It was an old way of obtaining focus in an overhead projector. It would have been obvious to use it.

23. The accused Porta-Scribe projector also has essentially the same structure as the Junior Vu-Graph No. 2, which has an equivalent performance to that of the Porta-Scribe. The following differences exist: in the Porta-Scribe projector, the mirror is between the two lenses, while in the Junior Vu-Graph No. 2 it is before the two lenses. This is immaterial, since the mirror would normally be placed between the lenses. It would have been

obvious to place a lens on either side of the mirror wherever compactness was sought. It would have been obvious to a person of ordinary skill in this field to put the mirror between the two meniscus lenses in an overhead projector.

24. In both the Porta-Scribe and the No. 2 Junior Vu-Graph focusing is accomplished by adjusting the distance between the stage and the entire lens assembly. In the Porta-Scribe, the entire head is raised, while in the Junior Vu-Graph No. 2 only the lens assembly is moved. This is an immaterial, mechanical modification. The light source differs, as in the case of the Junior Vu-Graph No. 1, but this is immaterial for the same reasons as applied to the Junior Vu-Graph No. 2.

25. The accused Porta-Scribe projector was intended to and did use only what was taught by the Junior Vu-Graph Nos. 1 and 2, plus mere ordinary skill of the art. In the minor respects in which the Porta-Scribe deviated from the Junior Vu-Graph, including the iodine-vapor lamp and lens curvature, Beseler utilized features which were in the public domain.

26. The claims of the patent in suit could apply to the prior art Junior Vu-Graph as well as they can be applied to the accused devices. Since patent claims may not be interpreted to cover what is taught by the prior art plus the application of ordinary skill, there is no infringement by the accused projectors.

27. Each of the following features was embraced in the patent in suit and each of those features was in the prior art: iodine-vapor lamp was old and its use was obvious; the in-line light source was old and its use was obvious; the elimination of the pre-condenser from the light source was old and was obvious; the use of Fresnel lenses in overhead projectors was old and was obvious; putting a mirror between two meniscus lenses to form a triangular arrangement was old and its use was obvious; the elevation of screen image by pivoting the projection head or mirror was old and its use was obvious; focusing by raising the projector head was old and its use

was obvious; locating the real image of the light source between the lens-elements was well known in projectors long before the patented projector and its use was obvious; keeping the axial ray radial to the surfaces of the first lens and passing through the center of the second lens was conventional and obvious; selecting the specific lens curvatures was within the skill of ordinary lens designers using prior art techniques; using a 10″ x 10″ stage size was old and obvious; using a 17″ height above the stage for the real image of the light source was dictated by the conventional prior art focal length of 14 inches, and was old and obvious.

28. Each of these features of the patent serves the same functions as it did in the prior art and in the same way. The interaction in the patent projector of the various features set forth above is the same as occurred in the prior art. There is no unusual or surprising consequence from combining those features into a single projector. The accused projectors do not use the patent feature in which the ray relationship is variable, i. e., "generally radial" and "substantially through the center."

29. Each of the claims in suit is either anticipated by the prior art or has differences from the prior art which would have been obvious to an ordinarily skilled person.

30. The Porta-Scribe does not include either of the basic features of Appeldorn, the unitary head or the head pivoting arrangement. The accused projectors differ in structure from Appeldorn's in the following respects: Appeldorn's head is a rigid, unvarying, triangular arrangement of a mirror and two meniscus lenses, the whole arrangement pivoting with respect to the body "as a unit." This is a unitary head and is critical to Appeldorn's claimed invention. Without this unitary feature, the projector would not work as intended, to keep the image in focus despite elevation of the image; in the accused projector the head is segmented and articulated. It has four separate parts, each moving differently. One is a lens fixed to the body. The second is a

second lens which is movable. The third part is the mirror, which is also movable, and differently from the second lens. It is pivoted separately from the pivotal mounting of the second lens. The fourth is an angle-halving linkage which couples the mirror to the second lens and insures that the mirror moves through half the angle by which the second lens is displaced. Thus, the accused projectors have a segmented and articulated head, as distinguished from Appeldorn's unitary head. Appeldorn has a single pivot for his entire projection head. His patent describes three different ways of determining the location of that single pivot point: in each case the pivot point is above the first lens by a distance about equal to the (bent) spacing between the two lenses. It is above the center of the mirror by about half that spacing. The accused projectors have two separate pivots, one for the mirror and one for the second lens. Both pivots are at the same location, at the center of the mirror. This pivot location is above the first lens by only one-half the (bent) spacing between the two lens, or half as far from the first lens as in Appeldorn's, and at the center of the mirror, a position which Appeldorn says is unacceptable. The lens spacing in the accused projector is 4¾". In the patent projector it is 4½". The accused projectors are optically quite different from Appeldorn's.

31. The accused projectors differ in operation from Appeldorn's in the following respects: in Appeldorn's the relation between the axial ray and the lens axes is a variable one. It is a fixed relation in the accused projectors; in Appeldorn's the pivoting means serves to maintain his desired variable ray relation. In the accused projectors, the ray relation is independent from the pivoting means because of the angle-halving linkage; in Appeldorn's, the reflected axial ray is said to pivot about the center of the second lens and this is said to be essential. In the accused projectors no such pivoting occurs; in Appeldorn's, a 20 degree elevation of the screen image re-quires only a 10 degree tilt of the head. In the accused projectors such an elevation requires a 20 degree tilt of the movable head portion (containing the second lens). In Appeldorn's, his first lens, mirror and second lens all move 10 degrees for a 20 degree image elevation; whereas in the accused projector, the first lens does not move at all, the mirror moves 10 degrees, and the second lens moves 20 degrees.

32. The accused projectors are similar to the patent projector in certain respects; such as the iodine-vapor lamp, the in-line light system, the use of meniscus lenses, the curvature of the lenses, focusing by raising the head, locating the real light source between the projection lenses. In each of these respects the accused projectors utilize only the prior art, or the ordinary skill of the art. None of these produces any unexpected results.

33. The accused projectors differ in result from the Appeldorn projector in the following respects: in the Appeldorn projector, upon elevating the screen image, the image plane tilts backward, while in the accused projector it tilts forward. In the Appeldorn projector, upon elevating the screen image, it is impossible to correct keystoning while maintaining over-all focus, while in the accused projectors keystoning can be corrected while maintaining over-all focus. In Appeldorn, in higher image-elevation angles vignetting occurs, because of cutting off of some of the light cone by first lens mounting, while in the accused projectors no vignetting is caused by the first lens mounting upon pivoting the head, since the cone of light is fixed relative to the first lens. The Appeldorn device has automatic refocusing when the screen image is raised, requiring no focusing adjustment, while this is absent from the accused projectors. The accused projectors omit material limitations of the patent claims as follows: All of the claims of Appeldorn, except claim 5, include as an element of the claimed combination "a projection head consisting essentially of"

a pair of converging meniscus lenses and a reflecting means positioned in triangular arrangement between these lenses. The accused projectors have additional and essential elements in the head. They have the separate pivotable mountings for the second lens and mirror and the angle-halving linkage coupling these mountings. These elements are essential because they create an exact coaxial lens-to-ray relationship, and cause the entire cone of light to enter the lens system for all tilt angles. Without these additional elments, the head would not be able to produce the simultaneous elimination of keystoning and maintaining of uniform focus. Without these elements, the second lens and mirror would be fixed to the stationary first lens, and the structure would be a fixed, non-pivotable head incapable of elevating the screen image, which is an essential objective of the patent. The accused projector does not have a head "consisting essentially" of the same elements as Appeldorn's. All claims recite a variable ray relationship to the effect that the incident axial ray is "generally radial to the mean curvature" of the first lens and the reflected axial ray passes "substantially through the center" of the second lens. The accused projectors have a fixed and exact ray relation, not a variable one. Some of the claims also recite "means for pivoting said mirror", or "means pivotally supporting said head", or "means for pivoting said reflecting surface" for vertical adjustment of the screen image and for the purpose of maintaining the Appeldorn ray relationship. These claims therefore require that it be the pivoting means which maintains the ray relationship. Not so in the accused projectors, where the ray relation to the first lens is entirely independent of the pivoting (rather than being maintained by it) and where the different structure produces a different (fixed) ray relationship. Claims 3 and 4 recite that the head is "unitary" and that this unitary head pivots. The accused head is not unitary, but segmented and articulated, and does not pivot as a unit. Claim 7 requires a lens spacing (S value) between lenses of 114.29 millimeters (4½ inches). The lens spacing of the Porta-Scribe projectors is not this value, but about 4¾ inches. The accused devices are materially different in structure, in operation, and in result, from Appeldorn. They use no inventive contribution of Appeldorn and do not infringe Appeldorn.

34. In 1960 or 1961, Appeldorn undertook to redesign 3M Models 42 and 43 overhead projectors to make them less costly and less bulky. They had a high quality, three-element lens arrangement (Cooke triplet). The cost of such a lens made it an obvious point of inquiry for reducing cost as well as bulk. Early in 1961 the idea occurred to reduce head size by putting a mirror between two of the lens elements, instead of on one side of the entire lens system. This change was old and obvious. Appeldorn discussed the question of cost with Gilkeson, Chief Engineer of 3M's Wollensak Division at Rochester, N. Y. It was Gilkeson who suggested the use of meniscus-shape lenses. Gilkeson then supplied sample lenses to Appeldorn. The first lens system was a barrel with two stock coaxial meniscus lens elements. Appeldorn tried it and asked Gilkeson to design special lens elements for use in a triangular arrangement. By December 11, 1961, Appeldorn thought he had made a discovery. He submitted an invention disclosure to 3M's patent counsel. This disclosure did not refer to meniscus lenses at all. What Appeldorn thought he had discovered was a rigid triangular arrangement. He made no claim to having suggested that the meniscus-shape lenses be used. Thereafter, the special lenses that Appeldorn had requested were designed. Gilkeson turned over to his assistants, Conrad and Lynch, the task of determining their curvatures. Conrad and Lynch designed the specific lenses disclosed in the patent and determined their curvatures specifically in claims 7 and 8 of the patent. Appeldorn did not specify any radii of curvature. Thus it was Gilkeson who

suggested to Appeldorn that the pair of meniscus lenses be used. The idea of using meniscus-shape lens did not originate with Appeldorn. The meniscus-shape is an essential feature of the invention. All of the claims of the patent are limited to a combination including "a pair of (or "first and second") converging meniscus lenses." The patent specification describes in minute detail the size, shape, and composition of these lenses and the requirement that they be meniscus in shape. 3M urged to the Patent Office that the claims here in suit "were rewritten to better define applicant's invention over the cited references" by calling for "a projection head consisting essentially of three optical elements (a pair of converging meniscus lenses and a reflecting surface) * * *." 3M urged that its projector distinguished over Bancroft by claiming "converging meniscus lenses rather than the bi-convex lenses shown by Bancroft." 3M filed an affidavit of Appeldorn swearing to experimentation by him which purportedly demonstrated the superiority of the meniscus lens assembly. In plaintiff's brief filed with the Court of Appeals for the Second Circuit in February, 1965, in review of this court's order on defendant's motion to transfer the case, plaintiff described the alleged invention as follows, "The invention of the patent relates directly to the optics of the projector. The lenses are, therefore, critical elements in the invention and are recited, in varying detail, in each of the claims of the patent in suit." At a hearing in the District Court of New Jersey, on 3M's motion to stay the New Jersey suit, counsel for 3M made this statement, "the plaintiffs (defendants here, plus Beseler) allege that the lens device is only one-thirtieth of the cost of this particular device. Well, whether it is one-thirtieth or not is immaterial because it is the patented invention." To its own sales representatives 3M (on the advice of its counsel), said the patent covers "any overhead projector which has a compact projection head consisting of a pair of converging

meniscus lenses and an intermediate mirror in a triangular arrangement." The meniscus-shape of the lenses of the patent in suit is an essential and crucial feature of the alleged invention, and the primary distinction urged by 3M over the prior art. This feature was not the invention of Appeldorn. Appeldorn was not the true inventor of the subject matter asserted and claimed in the patent. Appeldorn substituted for earlier asserted claims the nine claims which are the claims of the patent in suit. These new claims differ from the earlier claims in only two essential features: (1) the lenses were again restricted to meniscus shape; (2) language was inserted, directed to the exclusion of anything in the head except the two lenses and mirror; this was done by the term "consisting essentially of" and by the limitation that the ray pass "directly" from the first lens to the mirror and to be reflected thereby "directly" to the second lens. 3M represented to the Patent Office that both of these differences were new and patentably significant. It knew that neither was. With regard to the meniscus-shape of the lenses, 3M said that Bancroft did not suggest meniscus lenses and submitted an affidavit by Appeldorn attesting to the virtues of the meniscus shape. Appeldorn swore to detailed test data and graphs showing the superiority of the meniscus lens, and he attributed "immediate commercial success" and sales which "exceeded one million dollars within a year", to the patented projector and its meniscus-shaped lenses. Any competent lens designer would know that a pair of meniscus lenses as compared with bi-convex and plano-convex has better uniformity of resolution over a wide angle field of view. It was well known in the art that meniscus lenses were superior to Bancroft's lenses where, as in Appeldorn, the dilate aperture of the meniscus pair is small. The state of the art in these respects was not made known to the Examiner when 3M, through Appeldorn, was attempting to show his discovery of the use of a pair of meniscus

lenses instead of using plano-convex or bi-convex lenses of the same power. The very feature urged so strenuously to the Patent Office as a distinguishing feature over the prior art (the meniscus-shape lenses) was not conceived by Appeldorn. When threatened by rejection on the basis of prior art, which anticipated or rendered unpatentable everything else in the case, 3M brought in a feature which Appeldorn had not contributed, in order to obtain the patent. Only on this feature was the patent granted. It was known by 3M not to be Appeldorn's invention. The Patent Office was led to believe, contrary to fact, that it was Appeldorn who had contributed the idea of the use of meniscus-shape lenses for this projector.

35. 3M misrepresented the state of the art to the Patent Office in an attempt to cover the later and different device of Beseler's. 3M intended, prior to this suit, to assert the Appeldorn patent against Beseler and its customers, but gave no indication of that intention to them. By its conduct, 3M prevented Beseler from calling to the attention of the Patent Office the true facts as to meniscus lenses and as to other prior art.

### CONCLUSIONS OF LAW

1. Appeldorn Patent No. 3,126,786 is invalid in view of the prior art.

2. It is invalid because Appeldorn was not the true inventor of the subject matter of the patent.

3. It is unenforceable against the defendants because of plaintiff's inequitable conduct.

4. There has been no proof of infringement.

5. The complaint is dismissed for non-infringement, invalidity and unenforceability of the patent in suit, with costs.

6. Defendants' demand for attorneys' fees under Sec. 285 of Title 35, U.S.C., is denied.

Settle judgment on notice.