47 CCPA

### Application of Don CORNISH.
### Patent Appeal No. 6547.

United States Court of Customs and Patent Appeals.
April 6, 1960.

Don Cornish, pro se, Mason, Koleh-mainen, Rathburn & Wyss, Walther E. Wyss, Chicago, Ill., for appellant.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRK-PATRICK.[1]

MARTIN, Judge.

This appeal is from the decision of the Board of Appeals affirming the final rejection of claims 1, 3, 4 and 16 in application serial No. 271,030, filed February 11, 1952, entitled "Game Apparatus." It is stated to be a continuation of application serial No. 740,377, filed April 9, 1947. Several claims have been allowed.

Claims 1 and 16 are representative:

"1. Amusement apparatus for playing games like tic-tac-toe with game pieces and comprising structure defining at least a three dimensional multiple group playing position playing board, said playing positions being arranged in lines extending in said dimensions and also in groups each containing a plurality of positions, and means of chance for determining a group of playing positions in which a play may be made by placement of a game piece.

"16. Amusement apparatus comprising a structure movable into various angular positions during play and including a panel having apertures therein and game pieces adapted to be placed therein said game pieces being made of a readily and substantially deformable resilient material whereby they can be readily inserted into and removed from the apertures from either side of the panels, the game pieces being dimensioned so as to be deformed when inserted into the apertures whereby their resiliency holds them in the apertures."

The invention claimed in this case relates to a 3-dimensional game like tic-tac-toe. Instead of the 9 squares in which "X's" and "O's" are placed by competitors, the customary tic-tac-toe game with which most of us are familiar, the game of the invention is played with at least three parallel planes, preferably transparent pieces, spaced equally from each other and attached to a common base, each having at least 9 playing positions (3 x 3). Thus, in each of the planes it is possible to win by being the first to complete a horizontal, vertical or diagonal row of 3 squares. Additionally, it is possible to win by completing a row or diagonal row consisting of one position in each of the three planes. While such a game may be played as a game of skill by at least two participants, it may also be played as a game of chance, and it is to this that claims 1, 3 and 4 are directed.

As a game of chance, means such as dice are used. One die determines the plane, another a column in that plane, and a third, the row in that plane in which a game piece is to be placed. Each die, therefore, determines a "group of playing positions," the net result of the three dice determining but a single position within the three planes. Additionally, a player may be given a free choice of play within any of the three groups by appropriate markings upon the dice.

[1]. United States Senior Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'Connell, pursuant to provisions of Section 294(d), Title 28 United States Code.

The groups of playing positions are marked by appropriate symbols on the game board and the dice each have corresponding symbols thereon.

Additionally the specification discloses the combination of a game board having apertures therein and deformable resilient game pieces insertable therein so dimensioned that they are resiliently held in the apertures.

The references relied on by the Board of Appeals are:

| | | |
|---|---|---|
| Gaylor | 715,474 | Dec. 9, 1902 |
| D'Autremont | 1,141,909 | June 1, 1915 |
| Abele | 1,421,656 | July 4, 1922 |
| Barnard | 1,564,746 | Dec. 8, 1925 |
| Heacock et al. | 2,313,473 | Mar. 9, 1943 |
| Hare et al. | 2,453,907 | Nov. 16, 1948 |

———◆———

The Heacock et al. patent describes a game board having three parallel spaced planes attached to a common support each of the three being a playing board having apertures therein to receive game pieces. Each of the boards has nine playing positions arranged in a 3 x 3 array. The Heacock et al. board is used for playing a game "similar to the well-known game of tick-tack-toe."

The Gaylor reference shows a game utilizing dice to indicate the number of spaces which a player may move a game piece on a multi-position 2-dimensional game board. The direction (forward, to the right, or to the left) and the particular piece which is to be moved are determined by the player.

In one embodiment described in the Hare et al. patent, each player is provided with a game board of a different color having a plurality of playing positions. In addition thereto, each player receives an identical number of each of several different varieties of game pieces. To determine who is to move a piece, a deck of cards having an equal number of cards of each color (corresponding to the players' boards) is used. Each of the cards, besides having the color indicia thereon has a marking corresponding to a variety of game piece. Thus, for example, if a green card having the number 1 is turned up, the player having the green board may move any one of his number 1 pieces one space.

The Barnard game is like tic-tac-toe It is played on a board having 25 sequentially numbered squares arranged in a 5 x 5 array. The first move for each player is determined by a draw of a card from a deck having a space number on it. Thereafter, the participants alternately place the game pieces according to choice on the game board until one gets 4 pieces in any row, column or diagonal.

The D'Autremont reference discloses a game quite like chess, having a game board which has each square thereon marked for identification so that moves made can be recorded.

The Abele specification discloses a game board having apertures therein and game pieces insertable in the apertures, the game pieces including spring means for resiliently retaining them in the apertures.

The Board of Appeals sustained the rejection of claims 1, 3 and 4 as unpatentable over Heacock et al. in view of each of Gaylor, Hare et al. and Barnard. Further relied upon were the D'Autremont patent and the games of Parcheesi and Backgammon. Since Gaylor, Hare et al., Barnard and the games of Parcheesi and Backgammon all show the use of chance means for determining a group of playing positions in 2-dimensional games, it was the board's opinion that the utilization of such means in the 3-dimensional game of Heacock et al. was

obvious. The term "group of playing positions" was felt to be broader than the meaning attributed to it by appellant, in that the games of the secondary references which offered a choice of moves when chance means were utilized met the claimed limitation. As to claims 3 and 4 which recite "distinctive symbols" (claim 3) and "distinctive coordinate symbols" (claim 4) and means of chance having corresponding symbols thereon, they were not considered to patentably define over the combination of references.

The board held claim 16 to be unpatentable over Abele, stating that the use of "conventional cork or rubber stoppers for the game pieces of Abele would involve a mere matter of choice between *obvious* alternatives." (Emphasis supplied.)

Appellant acknowledges that broadly all the parts of his game are old. It is his basic position, however, that the combination of references relied upon by the Board of Appeals would not suggest to the ordinarily skilled game designer the particular combination claimed. He also states that no reference shows his specific coordinate means for defining playing positions. It is also argued that the term "group of playing positions" means those positions lying along the co-ordinates, that is, the horizontal and vertical rows in each of the planes and the lines perpendicular to each of the planes through a set of corresponding playing positions in each of the planes. It is further stated that the claimed game wherein means of chance, instead of solely choice, are used to determine the playing positions has substantial "play value," especially for people who do not wish to overly exercise their minds when playing games for relaxation.

The solicitor's position is that the claimed invention is obvious in view of the cited art and that the term "group" need not be given the restricted meaning which appellant has attributed to it for the reason stated by the Board of Appeals. He additionally points out that Hare et al. refers to the exceptional "play value" of games giving to each participant an equal chance of winning. The solicitor also referred to appellant's failure in either his brief or at oral argument to discuss the rejection of claim 16 and stated that presumably claim 16 is no longer on appeal.

The issues simply stated are:

1. Does "groups of playing positions" have the especial significance attached to it by appellant?

2. Would it have been obvious to one of ordinary skill in the game art at the time appellant filed his application

a. to utilize means of chance with the 3-dimensional game board of Heacock et al., and

b. to add to the Heacock et al. game board coordinate symbols which, in conjunction with chance means having corresponding symbols thereon, would pinpoint a particular playing position?

3. Is the resilient game piece of claim 16 an obvious modification of the Abele game piece?

■ Apparently appellant has misconstrued the significance of his specification itself as a determinant of the breadth of the claims on appeal. Although specific features disclosed in a specification may render claims patentable if recited in the claims in sufficiently limited language, this does not mean that their definition in broad terms necessarily makes claims embodying them allowable over the prior art.

■ This court in In re Hooker, 175 F.2d 558, 560, 36 C.C.P.A. 1164, referred to by the board, properly states the law in this connection:

"Not only will terms in claims be interpreted broadly, but also limitations not expressed in the claims, though adequately stated in the specification, will not be read into the claim in order to avoid anticipation in the prior art."

Appellant seems to predicate patentability upon his allegation "that *not one single* three-dimensional parlor game of chance was invented" before his appeared. He has drawn his claims here on appeal and has argued his case assuming that this bare concept would be unobvious from the teachings of the prior art. With that we do not agree.

█ Insofar as claim 1 is concerned, there is no question but that the game board recited therein reads upon the Heacock et al. device. Besides the "three dimensional multiple group playing position playing board," the Heacock et al. board also meets the claimed limitation of "said playing positions being arranged in lines extending in said dimensions and also in groups each containing a plurality of positions." The Heacock et al. specification states, *inter alia*, that the invention relates to a "three dimensional game device" for playing a game similar to tic-tac-toe and that

> "Each of the shelves [playing boards] * * * is provided with a plurality of holding means defining playing positions to receive markers. * * * the holding means are simply holes 8 * * * of suitable size to receive balls 10 which serve as markers.
>
> *   *   *   *   *   *
>
> "The number of holes and balls may, of course, be varied, the above description being given merely by way of example. *The only essential is that the holes be arranged so that each will form an element of at least two lines in the same plane and at least one interplanar line.*" [Emphasis ours.]

Although Heacock et al. does not disclose "means of chance," the secondary references, Gaylor, Hare et al. and Barnard, do. The means of chance vary but we do not believe it unobvious for one skilled in the art to apply the teachings of these references to the Heacock et al. game to meet the broad limitations of

claim 1. We therefore affirm the rejection of this claim.

Claims 3 and 4 providing symbols on the game board and corresponding indicia on the means of chance do not define these limitations with sufficient certainty to patentably distinguish the claims from Heacock et al. in view of the secondary references. In the first place, symbols of playing card suits, Roman numerals, and various colors are a matter of choice, and having corresponding symbols on the means of chance is obvious if the means of chance is to have any determinative value in playing the game. Furthermore, those particular symbols are not recited as limitations in the appealed claim.

The portions of claim 3 stating that:

> "* * * certain of said positions being located in distinctive groups, distinctive symbols for indicating said groups and means of chance having corresponding symbols thereon for determining a group of positions in which a play is to be made."

and of claim 4, stating that:

> "* * * each of the positions is located in space by three coordinates, distinctive coordinate symbols on said board for locating said positions, and three devices of chance having thereon symbols corresponding to said distinctive symbols for determining positions in which a game piece is to be played."

has made possible so many variations that they read directly upon or are fully suggested by the secondary references especially in view of the fact that Heacock et al. teaches that the playing positions are to be arranged so that they define the *same* three coordinates in space utilized by appellant. The crux of the matter is that the claims do not define the groups or playing positions with sufficient definiteness nor relate the symbols in sufficiently limiting language to the various game board sections. Under

these circumstances we must sustain the rejection of claims 3 and 4.

Claim 16 is not patentably distinguishable over Abele since this reference shows "a panel having apertures therein and game pieces adapted to be placed therein." The requirement that the game pieces be "made of readily and substantially deformable resilient material" seems to us to be particularly obvious and as such does not involve patentable significance. Therefore, we sustain the board's rejection of this claim.

For the above reasons we affirm the decision of the Board of Appeals.

Affirmed.