**I.C.E. CORPORATION and Intercontinental Enterprises, Ex-Und Import GMBH, Plaintiffs,**

v.

**ARMCO STEEL CORPORATION, Defendants.**

United States District Court
S. D. New York.
Feb. 9, 1966.

Hubbell, Cohen & Stiefel, New York City, and Jacobi, Davidson & Jacobi, by Samuel L. Davidson, Washington, D. C., for plaintiffs.

Breed, Abbott & Morgan, and Byerly, Townsend, Watson & Churchill, New York City, by Howard J. Churchill, and Carroll G. Harper, New York City, for defendants.

TYLER, District Judge.

This is an action for declaratory judgment that United States Patent No. 2,-837,626 issued on June 3, 1958 ("the Buck patent") is either invalid or not infringed by the operation and production of certain welding machines made and sold by plaintiffs.[1]

The patent in suit relates to a method for producing spiral welded pipe or tubing. Plaintiffs have now moved for summary judgment upon the basic argument that the issues presented here are ones of law. More particularly, plaintiffs urge that the alleged invention of the Buck patent was anticipated and described in a printed publication or publications in the United States and foreign countries before the invention thereof (35 U.S.C. 102(a)) and, in addition, was described in a printed publication more than one year prior to the date of filing the application therefor, February 2, 1951. They also contend that the subject matter of the Buck patent is "not new, novel or unobvious" as required by 35 U.S.C. 102 and 103.

Practically speaking, however, as plaintiffs frankly concede, they rely here principally upon the assertion that a certain German patent application No. D93418 as reproduced upon microfilm frames stored in the Library of Congress and bearing the date of June 8, 1944[2] constitutes statutory prior art within the meaning of the statute and completely anticipates the Buck patent. In addition, plaintiffs apparently rely on other prior art, most particularly United States Patent No. 1,795,380 ("the Stresau patent") issued on March 10, 1931 to the corporate predecessor of defendant Armco Steel Corporation.

Defendants, of course, deny the validity of plaintiffs' contentions; further, defendants assert that issues of fact exist between the parties which only can be resolved at a plenary trial.

■ Generally, then, it can be said that this motion raises at least the following issues:

1. Is the German patent application endowed with all the requisites of a prior "printed publication" within the meaning of 35 U.S.C. 102(a) and (b)?

2. Does the German patent application and its related abstract, together with the Stresau patent, fully disclose and anticipate the invention of the Buck patent?

3. Are the Buck patent claims infringed by the spiral pipe welding machine produced and sold by plaintiffs?

For reasons to be indicated hereinafter, I agree with the defendants that these three basic questions are at least in substantial part questions of fact and thus must await resolution upon a trial.

The most interesting issue raised by this motion is whether or not the German patent application on microfilm (hereinafter sometimes referred to for convenience as "the microfilm") can be said to constitute prior art. The threshold question, thus, is whether or not the microfilm can be said to be a "printed publication" within the meaning of 35 U.S.C. 102. So far as can be determined, this has never been passed upon by the Court of Appeals or any district court in this circuit.

Before undertaking any legal analysis of the meaning and scope of "printed publication" as used in the statute, it would be well to note that from the docu-

---

1. For a concise statement of the nature of the controversy and its history, see opinion of Judge Metzner of this court, 201 F.Supp. 411 filed on December 22, 1961.

2. Presumably the filing date.

ments presented upon this motion, it appears that in February, 1949, the Office of Technical Services ("OTS") in the Department of Commerce released to the public a brochure or pamphlet entitled, "German Patent Technology Available Through the Office of Technical Services". It is stated therein, *inter alia*, that United States Army teams had microfilmed all patent applications found in the German Patent Office, numbering some 180,000 in all and covering the period from 1936 to 1945; that OTS Technical Bulletin T–50 describes these applications and lists the microfilm reels on which they appear; and that "individual PB numbers" had been assigned to each individually processed application up to July 1, 1948, but for applications dated after July 1, 1948, PB numbers were assigned to microfilm reels as a whole and not to each separate application appearing therein.

More particularly, plaintiffs have produced copies of documents from the Library of Congress tending to indicate that beginning in July, 1948, the German patent application in question could be found under the classification number PB 83377 on one or more of the aforesaid reels of microfilm. At that time, it seems clear, the Office of Technical Services was preparing and disseminating the publication known as, "Bibliography of Scientific and Industrial Research". This and related publications purported to set up a classification system for the various German patent applications on microfilm. Concededly, the German patent application in question

was listed and carried in this system under Classification 21h, and perhaps as well under Classification 21g.[3]

From this information and other documents submitted on the motion, plaintiffs would have this court hold that since July, 1948 the microfilm in issue has been a form of printing available to the public and thus a "printed publication" within the statute. Defendants, however, stoutly maintain that as a matter of law microfilms cannot be classified as printed matter for the purposes of 35 U.S.C. 102; further, say defendants, even if microfilms as such can be said to constitute printed matter, there are facts and circumstances here indicating lack of "publication"—i. e. lack of availability of the German patent in question to even the most sophisticated members of the public.

The term "printed publication" first appeared in the Patent Act of 1836[4] in addition to the term "public work" which had been used in the previous patent law.[5] The 1836 Act provided that a "printed publication" could bar an applicant from obtaining a patent[6] and further sanctioned as a defense to an infringement action that either a "printed publication" or a "public work" could invalidate a patent.[7] The diference between the two terms has been explained by a textbook writer to be that a "public work" referred to a class of established publications or a book publicly printed and circulated, whereas a "printed publication" was considered "broad enough to include any description printed in any form and published or circulated to any

3. "21. Electrotechnics * * *
    g. Electrical appliances and methods in general (exclusive of electrochemical), including electromagnets, automatic circuit breakers, condensers, magnetic devices for relieving pressure on journals, etc., and Roentgen ray apparatus.
    h. Electric heating, cooking, vaporizing, fusing, soldering, and welding processes and apparatus so far as relating to the production of heat." (Plaintiffs' Exhibit H).

4. Act of July 4, 1836, ch. 357, §§ 7, 15, 5 Stat. 117.

5. Act of February 21, 1793, ch. 11, § 6, 1 Stat. 318.

6. Section 7 of the Act of 1836 provided that a patent was to be granted unless " * * * it had been patented or described in any printed publication in this or any foreign country, or had been in public use * * *."

7. Section 15 of the Act of 1836.

extent. * * *" [8] Another definition of "public work" was given during this same period in a copyright decision wherein it was stated that the term meant a "printed book" [9] and that printing was "a process of multiplying the copies by sheets." [10] It appears, however, that the difference in terminology contemplated in the Patent Act of 1836 was largely ignored by the courts. [11] In the Patent Act of 1870, [12] moreover, the term "public work" was replaced by or merged into the term "printed publication"; the latter term has been incorporated in all subsequent changes in the patent law. [13] The present day statute, nevertheless, still contemplates "public" knowledge or use. [14] By judicial construction, the word "public" in this context has been construed to mean "not secret". [15]

Over the years of changes in the patent statutes, the courts have failed to enunciate a uniform standard of what constitutes a "publication" or of what is "printed". As to "publication", while some courts have said that a prior disclosure anticipates an invention only if it is in "general circulation" or "on sale", [16] others have held to the view that there must be a sufficient disclosure to raise a presumption that the public concerned with the art would know of it; [17] still others have concluded that the statute requires no more than that the work be in restricted circulation. [18]

Similarly, as with the term "publication", some courts have construed the term "printed" very broadly. See Hamilton Labs, Inc. v. Massengill, supra, f. n. 18. In concluding that a typewritten paper constituted a "printed publication" and thus was prior art, the Patent Office Board of Appeals has reasoned that since the term "printed" was first utilized at a time when printing was the only means by which material could readily be distributed to the public as contrasted to the many modern methods of reproduction of writings, all at least capable of distribution widely and in quantity, such modern methods or types of reproduction should be considered akin to printing and thus, where appropriate, as constituting prior art. Gulliksen v. Halberg, 75 U.S.P.Q. 252 (Pat.Off.Bd.App.1937); see also Ex parte Brendlein, 105 U.S. P.Q. 453 (P.O.Bd.App.1955). [19] The Court of Customs and Patent Appeals, however, thereafter declined to follow this rationale in In re Tenney, 254 F. 2d 619, 45 CCPA (Patents) 894 (1958). It held that a microfilm copy of a German patent application in the Library of Congress, copies of which could only be obtained by application to the Secretary of Commerce, did not constitute a "printed publication" within the meaning of the statute. While it recognized that availability of the publication or reproduced material to the public, or at least a significant segment thereof, is a cru-

8. Curtis, Patents § 376 (3rd ed. 1867).

9. Keene v. Wheatley, 14 Fed.Cas. 180, 193 (No. 7644). (C.C.E.D.Pa.1861).

10. Id. at 192.

11. See Parker v. Stiles, Fed.Cas.No.10,749, 1 Fish.Pat.Cas. 319, 336, 5 Maclean. 44 (D.Ohio 1849). The court referred to "public work", "written publication" and "printed publication" on the same page of the opinion as though they were equivalents.

12. Act of July 8, 1870, ch. 230, 16 Stat. 198.

13. Rev.Stat. §§ 4886, 4920 (1875), as amended, 29 Stat. 692 (1897), as amended, 46 Stat. 376 (1930), as amended, 53 Stat. 1212 (1939), 35 U.S.C. § 102 (1952).

14. The word "public" is included in § 102(b) which makes a "public use" more than one year before the date of patent application a relevant prior art reference. 35 U.S.C. § 102(b) (1952).

15. See Gillman v. Stern, 114 F.2d 28, 31 (2 Cir. 1946).

16. See Cottier v. Stimson, 20 F. 906 (9 Cir. 1884).

17. Camp Bros. & Co. v. Portable Wagon Dump & Elevator Co., 251 F. 603 (7 Cir. 1917).

18. Hamilton Labs, Inc. v. Massengill, 111 F.2d 584 (6 Cir. 1940).

19. For a provocative glimpse at what the future holds for printing, see "Goodby to Gutenberg", in the January 24, 1966 issue of Newsweek.

cial concept underlying the statute, the Court of Customs and Patent Appeals concluded that, on account of legislative oversight, the statute's language did not permit a holding that microfilming is "printing". The rationale of the court is as follows:

> "While microfilming furnishes a means of multiplying copies, there is no *probability*, from a mere showing that a microfilm copy of a disclosure has been produced, that the disclosure has achieved wide circulation and that, therefore, the public has knowledge of it. The nature of present day microfilm reproduction differs from normal printing methods. Though one would be more likely than not to produce a number of copies of printed material, one producing an item by microfilming would be as apt to make one copy as many. In the case of printing, unless a number of copies were produced, a waste of time, labor and materials would result; present day microfilming methods, on the other hand, are as well designed to produce one microfilm as well as many without waste." [20]

■ At one time in our history the above rationale was probably valid, perhaps even as recently as in 1958 when *Tenney* was decided. Historically, setting of type has been such a costly operation that it has not usually been undertaken unless a considerable number of copies were to be produced; printing, therefore, has suggested a likelihood of fairly wide distribution of its fruits, and it has been reasonable to assume that all printed disclosures would become a matter of common knowledge. Today, however, inexpensive "printing" or duplication or reproduction is sufficiently common and comparatively inexpensive for one copy or a comparatively few copies as it is for many; thus, the new methods and techniques may not be and usually are not evidence, nor do they cast up a reasonable presumption, of wide dissemination of their proceeds. Nevertheless, such new techniques of conveying information as photocopying, photo-offset printing, computers, electrostatic printing, xerography and the like have won remarkably wide acceptance in a relatively short period of time. Among the earliest of these developments, the now familiar process of microfilming has assumed increased importance, particularly since World War II. Consequently, it is no longer reasonable to assume as the majority of the court in *Tenney* apparently did, that the traditional methods of "printing" are the only acceptable methods, for the purposes of Section 102. In the light of modern developments, a preferable rationale for the result in *Tenney* would have been that the microfilmed material, whether "printed" or not, was not shown to be sufficiently accessible to the public so as to constitute a "publication" within the meaning of the statute.

Only one case, to my knowledge, has held that a microfilm of a German patent application could be considered "prior art". Ex parte Garbo, 803 O.G. 315 (P. O.Bd.App.1962). Appellants in that case appealed from a decision of a Patent Examiner rejecting certain citations because they did not qualify as prior art. Among the rejected citations was a German patent application reproduced on microfilm and listed in the Bibliography of Scientific and Industrial Reports published by OTS. The Board of Patent Appeals, in holding that the citation could qualify as "prior art" even though the reference was upon microfilm, said, "In the four years since this decision [referring to *Tenney*] microfilm techniques have made significant advances in the field of scientific information. Today the complications of making scientific information available in the precise areas where it is needed have caused numerous changes in the traditional modes of distributing information. Today microfilm of the Examiner's search files as well as duplicate public search files is being

---

20. In re Tenney, 254 F.2d 619, 627, 45 CCPA (Patents) 894 (1948).

seriously considered." Ex parte Garbo, supra, at page 318. In its opinion, the Board also distinguished the *Tenney* case on the ground that the microfilm in *Tenney* had been misclassified.

After reviewing the cases in this area, it might be said that the term "printed publication" as contemplated by Congress in 35 U.S.C. 102 can include a document printed, reproduced or duplicated by modern day methods, including microfilming, upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.

To articulate this interpretation of the statutory concept of "printed publication" is to indicate that upon the present record I cannot hold as a matter of law that the microfilmed German patent application in issue and located in the Library of Congress meets the test. There is a question, for example, as to whether or not the microfilm is misclassified as defendants contend.[21] To adequately resolve such a question, it may well be desirable to hear expert testimony from qualified specialists in the field. Beyond this specific question, in any event, it will be incumbent on plaintiffs to establish, as a mixed proposition of fact and law, that the microfilm they rely upon fits within the aforementioned definition of a "printed publication" and thus constitutes prior art in the field.

What has already been said is enough to support denial of plaintiffs' motion.

Even were I to assume *arguendo* that the microfilm in issue constitutes a "printed publication", however, I am not sufficiently skilled in the art to certainly determine that the German patent application, either alone or when read with the Stresau patent, anticipates the Buck patent in litigation here. See Doehler Metal Furniture Co. v. United States, 149 F.2d 130, at page 135, 2 Cir., 1945; Bridgeport Brass Co. v. Bostwick Laboratories, 181 F.2d 315, at pages 316–319, 2 Cir., 1950. Without the aid of "expert testimony or other extrinsic evidence * * *", Messing v. Quiltmaster Corp., 159 F.Supp. 181, at page 184, D.C. N.J.1958, I cannot adequately interpret the claims in the Buck patent, those in the Stresau patent or the language in the German patent application, particularly in the face of defendants' contention, buttressed by an affidavit of John Timmers, ostensibly an experienced engineer in the field of research and development of spiral welded pipe, that certain portions of the microfilmed application are vague or ambiguous. Moreover, defendants have raised a factual issue, which may become important in the context of the pleadings, concerning plaintiffs' ability to manufacture commercially acceptable and workable machines by the method in issue. Plaintiffs' reliance upon the rule of Vermont Structural Slate Co., Inc. v. Tatko Bros. Slate Co., 233 F.2d 9, 2 Cir., 1956, therefore, is misplaced; unlike that case, the present controversy casts up patent claims and prior developments which are not easily understandable to persons unversed in the art.

The motion for summary judgment is denied. It is so ordered.

---

21. Defendants urge that the German application should have been placed within Classification 7 ("Sheet metal, tube and wire making and working, also metal rolling.") as promulgated by the Office of Technical Services.