The **GARRETT CORPORATION**
v.
The **UNITED STATES**.
No. 312–65.

United States Court of Claims.
Feb. 20, 1970.

Wayne L. Benedict, Washington, D. C., atty. of record, for plaintiff. James P. Burns, Robert S. Swecker, and Burns, Doane, Benedict, Swecker & Mathis, Washington, D. C., of counsel.

Vito J. DiPietro, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM.

This case was referred to Trial Commissioner James F. Davis with directions to make findings of fact and recommendations for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on

June 23, 1969. Exceptions to the commissioner's findings and recommended conclusion of law were filed by defendant. Plaintiff filed no exceptions and urged that the recommended conclusion of law be adopted by the court. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, it is concluded and held that claims 2, 5, and 6 of the Walker patent (U.S. Patent No. 2,914,779) are invalid and claim 3 thereof is valid and infringed and further that claims 1–3 of the Taylor patent (U.S. Patent No. 2,804,633) are valid and infringed. Plaintiff is entitled to recover reasonable and entire compensation for unauthorized use by defendant of these valid and infringed patent claims and judgment is entered for plaintiff accordingly with the amount of recovery to be determined pursuant to Rule 131(c) (2). All claims asserted in the petition, other than those for which plaintiff is held to be entitled to recover, are dismissed.

## OPINION OF COMMISSIONER

DAVIS, Commissioner.

This is a patent suit under 28 U.S.C. § 1498 to recover "reasonable and entire compensation" for alleged unauthorized use by the government of inventions disclosed and claimed in two patents owned by plaintiff. Only the issue of liability is before the court; accounting, if any, is deferred to later proceedings. The patents in suit relate to inflatable life rafts. No. 2,914,779 (the "Walker" patent) discloses a boarding ramp to assist survivors in the water to board the raft. No. 2,804,633 (the "Taylor" patent) discloses improved structure for mounting and supporting a canopy over the raft. Plaintiff contends that claims 2, 3, 5,

and 6 of the Walker patent and claims 1–3 of the Taylor patent are infringed by a government-procured raft designated type F–2B, made by the Patten Company, Lake Worth, Florida, in accordance with two military specifications.

The issues before the court are patent validity under 35 U.S.C. §§ 102, 103, and 116, and patent infringement. Defendant contends that claims 2 and 3 of Walker are invalid under §§ 103 and 116; that claims 5 and 6 are invalid under §§ 102(b) and 103; and that none of claims 2, 3, 5, and 6 are infringed, even if valid. Defendant further contends that claims 1–3 of Taylor are invalid under §§ 102(a) or (b) and 103, and that claim 3 is not infringed. Defendant concedes that Taylor claims 1 and 2 are infringed, if valid.

## WALKER PATENT

Walker describes a boarding ramp for use in conjunction with an inflatable life raft. The life raft, admittedly old, consists of two superposed inflatable tubes with a fabric floor in between. The tubes encircle the floor to form an occupant-receiving space. The boarding ramp comprises a pair of inflatable tubes, called in the patent specification "structural beams," which are attached in cantilever fashion to the raft. The beams extend outward horizontally from the raft parallel to each other and are connected together across their tops by impervious fabric to form a deck-like surface to which is attached handles for grasping by a survivor in the water. The ramp provides a rigid, buoyant structure at water level by which survivors are supported and assisted into the raft.

In one embodiment of the ramp, the deck fabric extends around the outboard end of the beams and is turned up and secured to the underside of the deck to form a water ballast pocket at the end of the ramp. The pocket has ports underneath the deck near the deck surface

---

* The dissenting opinion of NICHOLS, Judge, in which SKELTON, Judge, joins, follows the opinion of the trial commissioner which has been adopted by the court.

and above the normal water line of the ramp. Water thus enters the ballast pocket only when the end of the ramp is submerged sufficiently to lower the ports below water level. The patent specification says

When the ramp is boarded from the water the free end of the beams * * * will yield slightly so that the upper surface of the deck member will be substantially at water level. When the ramp is in this position the ports * * * will be below the normal or average water line and water will flow through the ports into the water ballast pocket * * *. * * * The ports * * * are intentionally located above the normal water line * * * when the boarding ramp is unoccupied so that a larger quantity of water will be maintained in the pocket * * *. Thus, this boarding ramp, while functioning to facilitate entry onto the life raft * * *, additionally functions to provide stability to the entire raft.

Claims 2, 3, 5, and 6 are set out in finding 6. In essence, claims 5 and 6 define the ramp (i. e., the structural beams covered by fabric deck) in combination with an inflatable life raft. Claim 2, similar to claims 5 and 6, further recites the water ballast pocket which the claim says causes the ramp "to function as an outrigger and provide stability to the life raft." Claim 3, similar to claim 2, defines the water ballast pocket as having "access means located above the normal water line when the ramp is unoccupied for admitting water to said pocket."

*Validity of claims 5 and 6*

Defendant says claims 5 and 6 are invalid as anticipated under 35 U.S.C. § 102(b) by a document (hereafter the "British report") entitled "Boarding of Large Inflatable Dinghies from the Water," prepared in 1949 by V. N. Drake for the Marine Aircraft Experimental Establishment, a British Government agency. The British report, not considered by the Patent Office during prosecution of Walker's patent application, is a summary including drawings and photographs of work done in Great Britain up to 1949 to develop boarding devices for large life rafts. Among other things, the report discloses a boarding ramp, for use with inflatable life rafts, comprising a pair of inflatable beams secured to a life raft and extending outwardly therefrom in horizontal plane at water level. A fabric apron is stretched across the beams and is fastened to their tops to form a deck. Between the beams at their outer ends is a so-called thwart, which is simply a small diameter inflatable tube connecting together the beam ends.

The British report describes tests of the boarding device, noting that it was "an extremely stiff appendage"; that "the rigidity of its outer end was quite surprising"; that "boarding proved to be fully as easy as previously"; but cautioning that "attachment [to the raft] needs to be very strong" to avoid damage by heavy weather. The report further noted that at tests, the device "started to tear apart from the main beam," probably due to "incomplete curing of the rubber solution" used to cement the device to the raft.

Plaintiff challenges the British report as anticipatory prior art on two grounds: (1) It is not a "publication" within the meaning of 35 U.S.C. § 102(b) because "it was not made available to the public more than one year before the filing date of the Walker patent application [filed December 9, 1955], and (2) even if statutory prior art, the report fails to anticipate because it teaches nothing more than an "abandoned unsuccessful experiment" which was an "admitted failure." Neither contention has merit.

 To be a "publication" under the statute, a document must, among other things, be accessible to the public.[1] Badowski v. United States, 164 F.Supp.

---

1. It must also be "printed," but that is not an issue here.

252, 143 Ct.Cl. 23 (1958); I ROBINSON, PATENTS, §§ 325–27; I WALKER, PATENTS, § 60, at 272–77 (Deller's 2d ed. 1964). The public, for purposes of the statute, constitutes that class of persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents. Jockmus v. Leviton, 28 F.2d 812 (2d Cir. 1928); Camp Bros. & Co. v. Portable Wagon Dump & Elevator Co., 251 F. 603 (7th Cir. 1917), cert. denied, 248 U.S. 572, 39 S.Ct. 11, 63 L.Ed. 427 (1918); I.C.E. Corp. v. Armco Steel Corp., 250 F.Supp. 738 (S.D.N.Y.1966). Factors bearing on whether a document was published include the number of copies made, availability, accessibility, dissemination, and even intent. In re Tenney, 254 F.2d 619, 45 CCPA 894 (1958).

██ About 80 copies of the British report were distributed in Great Britain prior to 1955 to various British Government agencies, American Government personnel in Great Britain, and 6 commercial companies. The report was unclassified and unrestricted in its use. While distribution to government agencies and personnel alone may not constitute publication (Ex parte Suozzi, 125 USPQ 445 (P.O.Bd.App.1959)), distribution to commercial companies without restriction on use clearly does. Also pertinent is the fact that after 1950, the report was made available for dissemination in the United States through the Defense Department to government contractors who were advised of its availability and could obtain copies upon request at no cost. Coupled with distribution in Great Britain, evidence of availability in the United States to an interested segment of the public shows intent to make the contents of the report freely accessible. In re Tenney, supra; Hamilton Laboratories, Inc. v. Massengill, 111 F.2d 584 (6th Cir. 1940), cert. denied, 311 U.S. 688, 61 S.Ct. 65, 85 L.Ed. 444. See also T. L. Crisman, In-House Publications—Can They Endanger Rights in Technical Information? 49 J.PAT. OFF.SOC'Y 549 (1967).

Therefore, the British report was a "publication" within the meaning of 35 U.S.C. § 102(b), and it is statutory prior art with respect to the Walker patent.[2]

██ Plaintiff's argument that the British report is not anticipatory because it teaches an "abandoned unsuccessful experiment" is misplaced. That argument bears on the question of prior public use, a defense not here asserted. See Thacher v. Inhabitants of Town of Falmouth, 235 F. 151, 158 (D.Me.1916), aff'd, 241 F. 869, 154 CCA 571 (1st Cir. 1917). A publication anticipates if it discloses all the elements of the claimed invention, or their equivalents, functioning in substantially the same way to produce substantially the same result, and if it teaches sufficient information to enable one skilled in the art to practice the invention. International Glass Co., Inc. v. United States, 408 F.2d 395, 187 Ct.Cl. 376 (1969); Thacher, supra; I WALKER, PATENTS, § 60, at 277–80 (Deller's 2d ed. 1964). The British report clearly meets these criteria. It teaches an inflatable life raft in combination with a boarding ramp having all the elements recited in claims 5 and 6, and the elements function in substantially the same way to produce substantially the same result.[3]

2. Defendant proved distribution of the British report in Great Britain by evidentiary deposition of a British Government employee, L. N. Green, who at one time was charged with disseminating technical documents and was familiar with record-keeping practices of his agency. Though Green had no personal knowledge of distribution, he authenticated official records which were probative and reliable to establish that, in the ordinary course of business, distribution was made. 28 U.S.C. § 1732(a). See also Bridger v. Union Ry. Co., 355 F.2d 382, 391 (6th Cir. 1966).

3. The ramp of the British report has an additional element not recited in the claims, viz. the thwart connecting the ends of the

Test problems noted in the British report in no way diminish its anticipatory value. The problems relate to fastening the ramp to the raft, not to the raft structure and design per se; and the problems' solution, within ordinary skill in the art, was even suggested in the report. (See finding 10.)

■ Claims 5 and 6 therefore are invalid under 35 U.S.C. § 102(b).

*Validity of claims 2 and 3*

Defendant says claims 2 and 3 are invalid under 35 U.S.C. § 103, which requires that the invention be unobvious to one of ordinary skill in the art at the time it is made. Resolution of this issue requires factual analysis of (1) the scope and content of the prior art, (2) the differences between the prior art and the claims in issue, and (3) the level of ordinary skill in the pertinent art. Graham v. John Deere Co., 383 U. S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Martin-Marietta Corp. v. United States, 373 F.2d 972, 179 Ct.Cl. 70 (1967).

As prior art, defendant relies on the British report, above discussed, and in addition, documents which show that it was old at the time the invention in suit was made to use water ballast pockets on inflatable life rafts to increase stability. A U.S. Army specification in 1944, entitled "Raft, Pneumatic, Type A3A," called for water ballast pockets on each side of the raft, secured underneath the buoyancy tube and below the normal water level of the raft. Thus, the pockets filled with water immediately when the raft was put afloat and remained filled as long as the raft was in upright position. The ballast pockets stabilized the raft by minimizing drift and by resisting overturn. More particularly, the pockets, protruding into the water, helped retard horizontal movement of the raft by wind or waves; and if the raft started to capsize, a pocket, as it was pulled out of the water, weighed

down on the raft so to resist overturn. Because wholly submerged, however, the pockets added no weight to the raft when in normal upright position. The British used similar ballast pockets on inflatable rafts at least as early as 1953, and one writer noted that the pockets helped make the rafts "extremely stable."

Plaintiff's water ballast pocket, unlike the prior art, is located on the ramp (rather than under the raft) and is not wholly submerged. It fills with water as the ramp end is lowered during boarding; and once filled, some of the water in the pocket remains above the ramp water line, thus adding weight, *and hence stability, to the raft in its normal upright position.*

■ Patent claims are the measure of the invention. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 409, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); White v. Dunbar, 119 U.S. 47, 51, 7 S.Ct. 72, 30 L.Ed. 303 (1886). To be valid, claims must define the invention with sufficient particularity to distinguish over the prior art and all obvious modifications thereof. In re Cornish, 277 F.2d 185, 188 (CCPA 1960); In re Lillich, 245 F.2d 471, 44 CCPa 991 (CCPA 1957); Minnesota Mining & Mfg. Co. v. Projection Optics Co., 256 F.Supp. 354, 362 (W.D.N.Y.1966). Claim 2 recites broadly the combination of the raft, boarding ramp and water ballast pocket at the end of the ramp. So defined, claim 2 reads on the combination of a raft-ramp of the British report and a water ballast pocket as taught by the prior art, the only difference being the location of the ballast pocket—on the ramp rather than the raft. Plaintiff says this difference is not obvious because placing the ballast pocket on the ramp, rather than the raft, provides greater stability against overturn. However, the prior art shows that ballast pockets were always placed as far outboard on rafts as practicable

structural beams. The thwart adds some buoyancy to the ramp and provides lateral

stability, but does not change its essential operating features.

to provide maximum stability against overturn; plaintiff's structure, as recited in claim 2, simply uses the same principle in an obvious way.

Claim 3, however, is a different matter. Unlike claim 2, it includes the limitation of access ports in the ballast pocket above the normal water line, a difference not taught or suggested by the prior art. The difference is significant because, as above noted, it permits a substantial part of the water in the pocket to remain above the normal water line of the raft and thus, unlike prior art ballast pockets, adds weight (and hence stability) to the raft.[4]

■ Bearing on the question of obviousness of placing access ports above the water line is a letter dated March 4, 1957, from L. E. Caldwell, engineering manager of Air Cruisers Company, a division of plaintiff, to J. T. Eubanks of plaintiff's patent department. Caldwell's letter apparently was in answer to queries by Eubanks about the correctness of locating access ports above the normal water line. The letter noted (emphasis added):

> The location of the inlet ports of the water ballast pocket * * * are [sic] *correctly* shown on drawing 3617 [corresponding to Walker patent Fig. 4]. * * * These holes were located above a normal or average water line *intentionally* so a larger quantity of water would be maintained in the pocket.

Later, during prosecution of the Walker patent application, the patent examiner also questioned the placement of access ports "above the water line." A similar explanation was made to the Patent Office and the patent specification so amended. The clear inference is that neither plaintiff's patent attorney nor the patent examiner recognized why access ports were located above the water line; and this is persuasive indicia of unobviousness.

■ In sum, the structure defined by claim 3 is not taught or suggested by the prior art; it provides a significant and unobvious difference over the prior art; and it is thus patentable under 35 U.S.C. § 103.

Defendant says claims 2 and 3 are invalid under 35 U.S.C. § 116 which requires that patent applications filed on inventions made "by two or more persons jointly" shall include the signature and oath of each inventor. Defendant contends that Robert Bicknell, a fellow-employee of patentee Walker, was a joint inventor of claims 2 and 3. The record shows that Walker and Bicknell were coworkers on a life raft project at Air Cruisers Company at the time the invention in suit was made. On February 14, 1955, Walker submitted to plaintiff an invention disclosure describing a boarding ramp essentially as shown in Figs. 1–3 of the Walker patent. The disclosure did not describe the water ballast pocket in combination with the boarding ramp (Walker patent Fig. 4). Later, Walker augmented his disclosure to add the water ballast pocket, noting in a memorandum that Robert Bicknell had suggested the idea. The memorandum referred to a drawing made by Walker which showed the construction details of the ballast pocket, particularly the placement of water access ports. Bicknell testified he could not remember suggesting the ballast pocket idea to Walker.

■ The burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence. Porter-Cable Machine Co. v. Black & Decker Mfg. Co., 274 F.Supp. 905, 913 (D.Md.1967), aff'd, 402 F.2d 517 (4th Cir. 1968), cert. denied, 383 U.S. 1063, 89 S.Ct. 716, 21 L.

---

4. The quantity of water in the ballast pocket above the water line of the ramp and raft depends, of course, on the load in the raft. When fully loaded, the raft rides lower in the water than when empty; and perhap when the raft is fully loaded, little, if any, of the water in the ballast pocket is above the water line. However, stability is most critical when the raft is not fully loaded, and it is then that the extra water in the pocket is most needed and effective.

Ed.2d 706 (1969). Joint invention connotes collaboration of effort to produce a complete and operative invention. One who merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor. Forgie v. Oil-Well Supply Co., 58 F. 871, 7 CCA 551 (3d Cir. 1893); Worden v. Fisher, 11 F. 505 (E.D.Mich. 1882). Focusing on claim 3,[5] the most that can be said on this record for Bicknell's participation in the inventive effort is that he apparently suggested the broad idea of a water ballast pocket for use in conjunction with a boarding ramp, an idea held above to be obvious in view of the prior art. Since Bicknell disclaims knowledge of even that much participation, we infer that he had nothing to do with the further unobvious, and more refined, concept of placing access ports above the water line. Walker made the drawing showing the ballast pocket structure, including the access ports, and apparently was solely responsible for construction details which made the device complete and operable. Accordingly, claim 3 defines a sole invention of Walker.

*Infringement of claim 3*

■ Infringement is made out if an accused device uses the same means functioning in substantially the same way to accomplish substantially the same result. Badowski v. United States, 140 F.Supp. 544, 135 Ct.Cl. 93 (1956); Barrett v. United States, 405 F.2d 502, 186 Ct.Cl. 210 (1968). The government's F–2B raft responds in terms to claim 3. Defendant does not contend otherwise. However, defendant denies infringement on the narrow ground that the end of the ramp on the F–2B does not remain "substantially at water level" when boarded and thus does not function like the patented device. Defendant also says plaintiff is precluded under the doctrine of file wrapper estoppel from applying the claim to its raft. Both arguments are groundless.

The dispute revolves around the phrase in claim 3 and in the specification "substantially at water level" which defendant says means "the ramp * * * does not sink into the water below the point where the water level would be tangent with the uppermost surface of the ramp ends." We think this is too narrow a view and inconsistent with the intent and reasonable construction of the specification and claims. During trial, the parties conducted tests of the F–2B raft, fully documented in the record by photographs. (See finding 16.) The ramp on the F–2B remained essentially horizontal during boarding and thus "substantially at water level" within the meaning of the patent. Admittedly, the outboard end of the ramp submerged momentarily during boarding under the weight of the boarder; but this was contemplated in the patented structure whose "free end of the beam" was intended to "yield slightly."

■ The defense of file wrapper estoppel is not appropriate in this case. It is a doctrine which prohibits patentees from construing claims inconsistent with limitations added during Patent Office prosecution to distinguish over prior art. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct.

---

5. Since claim 2 is invalid for obviousness, the question of inventorship of its subject matter is moot. However, if not obvious, claim 2 presents an irreconcilable dilemma on inventorship. Walker made oath in his patent application that he was the sole inventor of the subject matter of claim 2. At trial, he testified otherwise, and his memorandum of March 28, 1955 supports the testimony. Thus, either (1) Walker and Bicknell are joint inventors of claim 2, or (2) Bicknell was sole inventor. On this record, Bicknell cannot be a joint inventor since he disclaims knowledge of joint participation and thus cannot make oath to joint inventorship so to correct the patent under 35 U.S.C. § 256. Nor has plaintiff sought correction. *A fortiori*, Bicknell is not a sole inventor; and even if he were, the patent could not be corrected because no proper inventor was named *ab initio*. Koehring Co. v. E. D. Etnyre & Co., 254 F.Supp. 334, 359 (N.D.Ill.1966), and cases cited therein.

513, 86 L.Ed. 736 (1942); Autogiro Co. of America v. United States, 384 F.2d 391, 181 Ct.Cl. 55 (1967). Plaintiff here attempts no such construction. During Patent Office prosecution, claim 3 was amended to say that the structural beams, which form the support members of plaintiff's boarding ramp, have "sufficient rigidity and buoyancy when inflated to maintain the free end of the ramp substantially at water level when the ramp is boarded from the water." The limitation was added to distinguish over a prior art device (shown in a British patent to Albrecht, finding 9) which submerged completely during the boarding process to form an inclined ramp under water. By so limiting the claim, it is assumed plaintiff did not intend to narrow its scope any more than necessary to distinguish over the art. Hunt Tool Co. v. Lawrence, 242 F.2d 347, 354 (5th Cir. 1957), cert. denied, 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1428. No doubt plaintiff is estopped to read claim 3 on a device like Albrecht. However, defendant's device is not like Albrecht's but rather is identical to plaintiff's, and it functions in substantially the same way.

Claim 3 therefore is infringed.

## TAYLOR PATENT

Taylor discloses a structure for supporting a canopy over an inflatable life raft. Fully described in finding 17, the structure comprises in essence short posts supported by and spaced around the inside upper perimeter of the raft buoyancy tube. The posts incline outwardly of the raft at about a 45° angle and are held in position by tubular sockets and grommeted flaps which are fastened to the tube. Points around the outer edge of the canopy are attached to the top of the posts; and the canopy is thereby supported atop the raft much like a conventional tent. Near the bottom of each post is a U-shaped clip, permanently hinged to the post and called in the patent specification a "spring-wire, bail-like member." The clip swings underneath the bottom of the socket when the post is in place, thus holding the post secure in the socket and preventing inadvertent lengthwise movement up or down.

The patent specification says that the canopy structure has the following advantages: (1) Because the posts are not supported by the raft floor, they are short and thus more conveniently stowed with the raft in deflated condition; (2) the posts do not obstruct occupants of the raft; and (3) the outward inclination of the posts permits the canopy to extend over the raft tubes, like eaves, to provide better protection against sun and weather. Evidence at trial (discussed later) further established that fewer posts are necessary to support a canopy in the Taylor structure than in prior structures where the posts were vertical, rather than inclined.

Claims 1–3, set out in finding 18, define the canopy structure in combination with a life raft. Claim 1 is representative:

1. A life raft comprising

a flexible-walled, fluid distensible buoyancy member of substantially circular cross-sectional shape,

a canopy-supporting post, and

means for supporting said post, wholly from said buoyancy member, in an outwardly inclined position, said means comprising

post-holding means secured to the inboard side of the fluid distensible buoyancy member and wholly supported directly thereby.

Claim 2 defines the "post-holding means" as "an apertured fabric member" and a "molded rubber tubular member." Claim 3 addes the hinged clip, defined as "means for limiting endwise movement of the post."

*Validity of claims 1–3*

Defendant says claims 1–3 are invalid under 35 U.S.C. § 102(b) as anticipated by two prior art life rafts used by the government in the World War II era. Alternatively, defendant says the claims are invalid under 35 U.S.C. § 103 as de-

fining an invention which is obvious within the meaning of the statute. The Navy used two life rafts in the mid-1940's, designated the Mark IV sailing raft and the AR–10 pneumatic boat, described in finding 21. The Mark IV was experimental; and it is not clear from the record to what extent it was procured and used. Likewise, the extent of procurement and use of the AR–10 is not clear. Both devices were essentially inflatable tube rafts, designed to hold 4 and 10 persons, respectively. Both had canopies and canopy-support structures. The support structures included posts secured around the inside lower perimeter of the buoyancy tube by means of sockets and apertured fabric flaps. The sockets and flaps were aligned to hold the posts vertical, rather than outwardly inclined. Defendant contends that the canopy structures of the Mark IV and AR–10 are "identical" to that defined in claims 1–3, with the "possible exception of the angle of inclination" of the support posts. The record is clear that neither the Mark IV nor AR–10 show or suggest outward inclination of the canopy posts. Rather, the posts, if inclined at all, appear to have been inclined slightly inwardly, not outwardly, when supporting the canopy. The Mark IV and AR–10 therefore fail to anticipate claims 1–3.

Whether claims 1–3 define an invention obvious under § 103 requires analysis along the guidelines set out in Graham v. John Deere Co., *supra*. The most pertinent prior art is the Mark IV and AR–10 rafts, neither of which was considered by the Patent Office during prosecution of the Taylor patent application. The structure of claims 1–3 differs therefrom only in the inclination of the canopy posts.[6] Defendant says this difference was obvious because it was "usual design practice" to provide an "outward inclination of the canopy posts," relying particularly on a patent to Hallward (finding 23), considered by

the Patent Office, which shows outward inclination of canopy poles on a life raft totally unlike the raft in suit. Defendant also relies on British Patent No. 726,833 to show the level of ordinary skill in the art at about the time the invention in suit was made. International Glass Co. v. United States, *supra*. The British patent is not statutory prior art because it issued after the filing date of the Taylor patent.

Deciding obviousness is fraught with dangers of hindsight reasoning. Our point of departure therefore must be analysis of the history of art to see how those skilled in the art approached and solved problems. Reiner v. I. Leon Co., 285 F.2d 501 (2d Cir. 1960), cert. denied, 366 U.S. 929, 81 S.Ct. 1649, 6 L. Ed.2d 388 (1961); Ellicott Mach. Corp. v. United States, 405 F.2d 1385, 186 Ct. Cl. 655 (1969). The Mark IV and AR–10 represent early attempts to provide protective canopies over inflatable life rafts. Canopy support posts were vertical and were mounted and supported wholly on the inside of the inflatable tube. Because the posts were verticle, the weight of the canopy tended to bow and bend them inwardly at their tops and the canopy tended to sag. In the AR–10, tie-cords were fastened to the canopy edge and secured near the raft floor to help support the canopy. There is no evidence that the Mark IV or the AR–10, or any other raft with vertical posts mounted wholly on the raft tube, were made the subject of a military specification. So far as the record shows, the Mark IV and AR–10 designs were abandoned.

About 1951, the art took a different course. The Air Force issued a military specification for a large, 20-man inflatable raft, designated F–2, in which the canopy was secured to 12 vertical posts, mounted on the raft floor rather than wholly on the inflatable tube. Because mounted vertically, the posts suffered the same tendency to bow and bend in-

6. Claim 3 also differs in reciting "means for limiting endwise movement of the post," *i. e.*, the hinged clip. However, such difference is not crucial to deciding obviousness.

wardly as did the Mark IV and AR–10. Nevertheless, the canopy structure remained unchanged from 1951 to 1957, through four revisions of the military specification.

In 1954, the patentees in suit came up with the idea of mounting the posts off the floor, high on the inside of the inflatable tube, and inclined about 45° outward from vertical, as shown in the Taylor patent drawing. By so doing, the posts were shortened and the weight of the canopy was made to act more along the longitudinal axes of the posts, thus reducing the bending moment and using more effectively the strength of the posts. The result was to reduce from 12 to 6 the number of posts needed to support the canopy on the government's 20-man raft. Fewer and shorter posts thus minimized the cost of the raft assembly and reduced its stowage weight by about 3 pounds. The new design was proposed to the Air Force by plaintiff in 1956, was adopted in 1957, and has been part of applicable military specifications ever since.

■ It would be an easy thing to say, as defendant urges, that plaintiff's canopy structure was but a slight and obvious modification of the Mark IV and AR–10. Indeed the change was a simple one; but often, as here, simple changes are unobvious when viewed in light of the history of the art. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L. Ed. 523 (1923). And it was a change from which flowed unexpected advantages in performance and cost as evidenced by its immediate adoption by the government. With respect to British Patent No. 726,833, cited to show the level of ordinary skill in the art, it does not teach inclined canopy posts but rather inflatable tubes, called "arched thwarts," to support the canopy. Posts secured to the exterior of the main buoyancy tubes are used to hold open an "entry mouth" through the canopy. The British patent therefore does not show "near simultaneous invention" of the subject matter of the Taylor pat-ent and thus is not pertinent within the meaning of the *International Glass* case. If anything, the British patent shows it was not obvious to those working in the art in the early 1950's to use canopy support posts, as described and claimed in the Taylor patent.

■ Plaintiff's canopy therefore was a substantial, unexpected and unobvious improvement over the prior art and was thus patentable under 35 U.S.C. § 103. United States v. Adams, 383 U. S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

*Infringement of claim 3*

Defendant concedes infringement of Taylor claims 1 and 2, if valid, but denies infringement of claim 3. Claim 3 calls for "means for limiting endwise movement of the post in the tubular portion of the tubular member" which, as described in the patent specification, is the hinged clip for preventing inadvertent lengthwise movement of the post when in place. Defendant says it uses neither a hinged clip, nor its equivalent to hold posts in the F–2B raft. Rather it uses an umbrella-type clip embedded in the post and positioned just under the apertured flap when the post is in place to prevent upward movement of the post; and it uses a socket, closed at its bottom end, to prevent downward movement of the post.

■ 35 U.S.C. § 112 provides that "[a]n element in a claim for a combination may be expressed as a means * * * for performing a specified function without the recital of structure, * * * and such claim shall be construed to cover the corresponding structure * * * described in the specification and equivalents thereof." Plaintiff therefore is not limited to the specific structure shown in its patent specification for "limiting endwise movement of the post." Stearns v. Tinker & Rasor, 252 F.2d 589, 597 (9th Cir. 1957); Chicago Pneumatic Tool Co. v. Hughes Tool Co., 97 F.2d 945, 946 (10th Cir. 1938), cert. denied, 305 U.S. 643, 59 S.

Ct. 146, 83 L.Ed. 415. Rather it is entitled to a range of equivalent structures which perform the same function.

Defendant says, however, that its structure is not equivalent because the claim phrase "in the tubular portion" must be construed to mean "around the tubular portion"; and that accordingly the claim should be limited to devices like plaintiff's hinged clip which fasten around the socket to prevent movement of the post. There is nothing in the patent specification or the file history of the patent application supporting this view. Rather it seems clear that the "means" clause in question is entitled to broad construction to cover any means by which the post is confined substantially in the socket against inadvertent removal when in place. Defendant's umbrella-type clip and closed-end socket so confine the post.

Finally, defendant says claim 3 is invalid, if construed so broadly as to be infringed, because the prior art teaches structure for confining posts in sockets in some respects similar to that used by defendant. For reasons above discussed with respect to claims 1 and 2, claim 3 is valid. It remains so irrespective of the breadth of construction of the final "means" clause. Claim 3 therefore is infringed.[7]

In sum: Claims 2, 5, and 6 of the Walker patent are invalid; claim 3 is valid and infringed. Claims 1–3 of the Taylor patent are valid and infringed.

NICHOLS, Judge (dissenting).

Respectfully I dissent, as I believe the court is making a mistake in adopting Per Curiam the commissioner's report, able as it is, without certain major modifications I deem to be necessary.

I would challenge the conclusions that claim 3 of U.S. Patent No. 2,914,779 (hereinafter, Walker patent), and claims 1–3 of U.S. Patent No. 2,804,633 (hereinafter, Taylor patent), are valid and in-fringed. Defendant says they are all obvious in view of prior art, and I agree.

In dealing with the Walker patent the commissioner wields a truly well honed scalpel, separating claim 3 from claim 2 which he holds obvious in view of prior art, and 5 and 6 which he says were anticipated. This means that the new invention of claim 3 is of exceedingly narrow scope: not the device of the boarding ramp to enable swimming survivors to board the raft, nor the water ballast pocket at the ramp's end to stabilize it, but only the placement of the ports for access of sea water to the pocket.

I presume that these rafts would roll as the crests of ocean seas passed under them, communicating greatly enhanced up and down movement to the end of a light, stiff extension, such as the ramp is, whenever it happened to lie at a right angle to the waves. It would be snatched abruptly from the swimmer's hands, and then would slap down, perhaps beating him upon the head. The device of trapping some sea water at the end of the ramp, to act as ballast, certainly looks like a valid answer, but it is not new, the commissioner tells us. This much being decided upon, it would certainly seem obvious that on the upward roll of the ramp, the ballast water would flow out and not serve its purpose, if the access ports were at the bottom. Any pocket that was going to serve as a tank would have to trap some water on the down roll, that would stay in place on the up roll, and it does not seem to me it takes any great inventive genius to discover that the way to accomplish this is to put the water access ports high on the side of the pocket. Anyone who did not see this would put the spout on the bottom of a tea kettle, if he had a chance. It is evident, also, that trapped air would obstruct the entry of water if the ports were low down. On the other hand, the conditions that made the ballast needful, i. e., heavy

---

7. Two military specifications on the F–2B require hinged clips substantially identical to plaintiff's. There is no evidence that the government procured rafts with such structure; if procured, however, they clearly infringe.

rolling, would thrust the ramp end under water at the low extremity of the roll, so the pocket would have water in it even before the first swimmer tried to come aboard. If the prior art water ballast pocket did not use something like this idea to trap the water I simply cannot imagine how it was of any use at all. It seems to me that anyone seeking to use the invalid claim 2 to guide him in building a life raft with boarding ramps using water ballast pockets at their ends, would inevitably design the pockets in such a way that they trapped water, and if they did they would be indistinguishable in principle from the pockets of claim 3.

Thus the commissioner's distinction between claims 2 and 3 I deem to be an excess of refinement and contrary to the Congressional reports quoted with approval in Graham v. John Deere Co., 383 U.S. 1, 14, 86 S.Ct. 684, 692, 15 L.Ed.2d 545 (1966):

> * * * An invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent. * * *

The Taylor patent teaches a way to make the canopy of such a life raft more extensive in horizontal area. Such canopies, of course, are to protect survivors from the effects of the sun and rain in case rescue is not immediate. On the prior art raft the canopy is attached to vertical poles socketed to the inside circumference of the upper circular flotation tube and the raft floor. The canopy sags loosely and therefore must have flapped distressingly in any breeze, yet it is small in relation to the size of the raft. It would not have been probable that such a defective canopy could have been tolerated very long except that, no doubt, the attention of raft designers was focussed on more essential structural features.

The Taylor invention angles the poles outward, fastening them to the tube only, not the floor. Thus the circumference of the canopy is larger, approximating the outer circumference of the raft, giving an "eaves effect." A spray shield can be kept rolled up around the canopy circumference, or let down and fastened in the "crotch" of the inflatable tubes. In the latter state it would seemingly act as a guy, further stiffening the canopy, but even with it up, the outward incline of the posts reduces the bending moment on them and uses their strength more effectively.

It would, I think, have been obvious to anyone that the prior art canopy was defective and needed improvement as soon as more essential difficulties with the design were deemed overcome. As to how improvement might come, the support of a canopy by outward inclining poles is familiar to anyone who ever attended a Barnum & Bailey circus. With its weather cloth down the involved canopy would appear substantially the same in structure as a circus tent. The principles of physics involved would become intuitively understood, I think, by anyone who had to deal with awnings, canopies, tents, spars, fabrics and ropes. I have a lot of difficulty imagining that anyone who recognized the prior art canopy as defective would not think of trying outward inclination of poles as a remedy. Defendant has, indeed, pointed to the Hallward patent drawings where canopy poles do incline outward but which the commissioner distinguishes on the dubious ground that the raft there patented is not of the inflatable type. This overlooks the fact that inflatable rafts are vessels, just as noninflatable ones are. Thornley & Pitt, et al., v. United States, 48 Cust.Ct. 134 (1962). They are subject to the same laws of physics that govern other vessels. This is not a case of a device having developed in one sphere of activity and being adopted in another one, completely different. I would not dispute that patentable invention might exist in such a case, because persons skilled in one art might not be aware of developments in another wholly distinct one.

I would dismiss the action because the inventions, after cutting away what was anticipated, represent advances on the prior art which are too small for notice under the patent laws, and would be tried by anyone who recognized the defects of prior art and wanted to experiment with the obvious means of correcting them.

SKELTON, Judge, joins in the foregoing dissenting opinion.